# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

SONYA FLETCHER,

     Plaintiff,

     v.

WILBUR L. ROSS,
*Secretary of Commerce*,

     Defendant.

Civil Action No. TDC-17-3419

## MEMORANDUM OPINION

Plaintiff Sonya Fletcher has filed this civil action in which she has alleged race and color discrimination and unlawful retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (2018), during her employment in the Office of the General Counsel of the National Oceanic and Atmospheric Administration ("NOAA"), a federal agency within the United States Department of Commerce.  Presently pending before the Court is a Motion for Summary Judgment filed by Defendant Wilbur L. Ross, the Secretary of Commerce ("Commerce").  Upon review of the submitted materials, the Court finds that no hearing is necessary.  *See* D. Md. Local R. 105.6.  For the reasons set forth below, the Motion will be GRANTED.

## BACKGROUND

Relevant background is set forth in this Court's Memorandum Opinion on Commerce's Partial Motion to Dismiss, in which the Court dismissed Fletcher's freestanding disparate treatment, discriminatory termination, and retaliation claims as time-barred.  *Fletcher v. Ross*, No. TDC-17-3419, 2018 WL 6031173, at *1-3, *6 (D. Md. Nov. 16, 2018).  The Court sets forth below

the facts relevant to the resolution of the pending Motion seeking summary judgment on Fletcher's remaining claims for color discrimination and retaliation based on a hostile work environment.

## I.       NOAA Employment

Plaintiff Sonya Fletcher is an African American woman who describes herself as having a dark complexion.  She began working for NOAA as a Clerk Typist in in 1991.  In 1998, she received a promotion to the position of a Secretary within the Office of the General Counsel at NOAA.  She was specifically assigned to the Office of the General Counsel for Fisheries ("GCF").  She began that position at the federal employment classification of GS-6, step 4, with GS-7 as the highest classification she could attain in that position.

In 2004, Fletcher she was placed under the direct supervision of Leila Afzal, the Deputy Assistant General Counsel for Fisheries/Financing Programs within GCF.  Beginning in 2006, her second-level supervisor was Alan Issenberg, the Assistant General Counsel for Fisheries.  Afzal and Issenberg remained Fletcher's first- and second-level supervisors, respectively, until she was terminated in 2011.

Afzal supervised three GCF attorneys, one paralegal, and two secretaries, Fletcher and Evangeline Davis.  Davis had become a GS-9 before Afzal became her supervisor in 2004.  Davis is an African American woman who Fletcher describes as being "light-skinned" and having a "fairly light" complexion.  Joint Record ("J.R.") 201, ECF No. 76.  Afzal, however, testified that she was unable to distinguish the two women's complexions.

From the time Afzal became Fletcher's supervisor until Fletcher's ultimate removal from NOAA, their relationship was difficult.  Afzal has stated that she began having concerns about Fletcher's performance soon after the two began working together.  For her part, Fletcher has stated that working for Afzal felt like being "under a magnifying glass."  J.R. 161.  According to

Samuel Chi, an attorney in GCF, Afzal yelled at Fletcher multiple times,  made "snide remarks" to Fletcher and would "say things . . . in a demeaning manner" to her.  J.R. 221-22.  Afzal did not treat Davis in this way and instead interacted with her in a "businesslike" fashion.  J.R. 222.

### A.    Promotion

One of Fletcher's chief complaints about her treatment in GCF was Afzal's approach to her possible promotion, especially as compared to Afzal's approach to Davis's possible promotion. At the time Afzal began as Fletcher's supervisor in 2004, Fletcher was a GS-6.  Fletcher soon began asking Afzal about the potential for a promotion to GS-7.  However, Fletcher claims that Afzal incorrectly told her that in her current position, she could not be promoted to a GS-7. Fletcher eventually learned from another source that she could, in fact, be promoted to a GS-7.  In September 2007, Fletcher was promoted to a GS-7, with Afzal's approval.

Within a year of her promotion to a GS-7, Fletcher requested another promotion.  Because GS-7 was the highest grade level available in Fletcher's current position, the only way for her to be further promoted was to have her position reclassified, which would have required the position to be filled through a competitive process, or to show that Fletcher had been performing significant duties beyond her position description, which was referred to as an accretion-of-duties promotion. According to Afzal, at the time, NOAA policy made accretion-of-duties promotions difficult to obtain.

At Fletcher's request, Afzal and Fletcher engaged in a series of discussions about how they could enhance Fletcher's duties in the office to bolster her case for an accretion-of-duties promotion.  According to Fletcher, Afzal refused her requests for training in financial skills, told her that Fletcher's job did not require her to think, and told her that she was "in a box."  J.R. 159. Afzal has stated that this allegation is based on a misinterpretation of her comment that they needed

to "think outside the box" in finding duties for Fletcher that would justify an accretion-of-duties promotion.  J.R. 9.  For example, Afzal has asserted that she proposed that Fletcher become an expert in various aspects of office operations, such as records management.

In October 2009, Fletcher and Afzal discussed some general steps for Fletcher to take in her professional development.  They disagreed, however, on what this discussion represented. Fletcher asserts that Afzal had committed to creating a "one-year promotional plan" for Fletcher. J.R. 166.  Afzal, by contrast, claims that she had merely invited Fletcher to develop and submit an "Individual Development Plan."  J.R. 11.  In March 2010, Fletcher followed up with Afzal by email, asking why there had been no action taken on the promotional plan, and Afzal responded that there was no such plan, and that their discussion had been about Fletcher's creation of an Individual Development Plan.  It is unclear whether further discussions about a promotion occurred after this exchange, but Fletcher was never promoted above GS-7.

Afzal took a different approach to Davis's desire for a promotion.  Davis was already at GS-9 when Afzal started at GCF and at some later point asked Afzal for a promotion.  Because Davis was also already at the highest grade level available for her position, she faced the same challenge that Fletcher did in justifying a promotion.  According to Afzal, she and Davis worked together "a lot" on developing the support for an accretion-of-duties promotion for Davis.  J.R. 55. Indeed, Afzal went so far as to represent in a proposal for an accretion-of-duties promotion that Davis was in charge of maintaining the office's law library, when in fact she was not. Nevertheless, Davis did not receive an accretion-of-duties promotion.

## B.    Change in Duties

Fletcher has objected to decisions by Afzal to change the duties assigned to her.  In 2006, Fletcher completed a temporary work detail to the National Weather Service.  Before she left,

budgeting duties for GCF had been shared between Fletcher and Davis.  When Fletcher returned to GCF, Afzal had assigned all budgetary duties to Davis.  Afzal testified that she did so because, after temporarily assigning Fletcher's budgetary duties to Davis during Fletcher's detail, she decided it made sense to have these duties managed by just one individual.  Fletcher, however, objected to the new arrangement, voicing concern that it would make it more difficult for her to get promoted.

In November 2009, Afzal assigned to Fletcher sole responsibility for maintaining the law library, managing records in the office file room, and managing office supplies.  Previously, at least some portion of the responsibility for the law library and the file room had been assigned to Davis.  Fletcher viewed this reassignment of duties as undesirable because the library and file room were "in a disarray" with "things all over the place," she had never had responsibility for the library or file room previously, and she was not provided with training on how to organize legal materials and agency records.  J.R. 168.  Moreover, it was difficult to answer the phone, another of Fletcher's duties, while working in the law library.  According to Afzal, she made this reassignment as part of a rewrite of Fletcher's position description to more accurately reflect the office's needs and Fletcher's role.  She has also stated that the changes were made because she had concerns about Fletcher's consistent failure to complete assigned tasks and that she came to understand that Fletcher and others were more likely to complete assignments if they were in areas over which the employee had sole responsibility.

Soon after this change, Fletcher asked her second-level supervisor, Issenberg, to reassign her to another supervisor based on "the harassment and discrimination that was going through Ms. Afzal."  J.R. 178.  Issenberg refused this request.  Issenberg has stated that he did so because such a reassignment would have required a reorganization of the office that he believed would be

inefficient.  However, Issenberg did offer to facilitate a mediation between Fletcher and Afzal, which Fletcher declined.

### C.     EEO Complaints

On December 8, 2009, Fletcher initiated an informal Equal Employment Opportunity ("EEO") complaint against Afzal for harassment and discrimination, including being repeatedly told she was not performing well, being told she was "in a box," and having duties taken away from her.  J.R. 169.  Afzal learned of Fletcher's EEO activity that same month.  Fletcher filed a formal EEO complaint on March 2, 2010.  In the complaint, she alleged that she had been subjected to disparate treatment and a hostile work environment because of race and color and in retaliation for her EEO activity.

### D.     Letter of Counseling

On April 26, 2010, Afzal issued to Fletcher a Letter of Counseling stemming from an incident relating to leave approval for Fletcher and Davis.  Due to a series of disputes between Fletcher and Davis over which of them was entitled to take leave at a certain time, Afzal, Fletcher, and Davis had agreed on a leave approval process.  However, on April 12, 2010, Fletcher confronted Afzal about a leave request from Davis that Afzal had approved outside the normal process.  According to Afzal, Fletcher waved a leave slip at her and, in a raised voice, demanded to know whether Afzal had approved Davis's leave, refused Afzal's request to come into her office to speak about it, made another dismissive comment to Afzal, and then turned her back on her and initiated a telephone call.  Fletcher, however, denies both waving a leave slip at Afzal and raising her voice.

In the Letter of Counseling, Afzal stated that Fletcher was "hereby put on notice that future acts of misconduct could lead to more serious forms of disciplinary action up to and including your removal from Federal Service." J.R. 125.

### E.    Written Reprimand

On October 20, 2010, Afzal issued a written Reprimand to Fletcher for "your failure to follow Supervisory Instructions." J.R. 127. The Reprimand arose from an interaction on October 1, 2010 during which Afzal instructed Fletcher to help a co-worker process travel requests, as the co-worker was new to the office and Fletcher had experience with travel request software. According to Fletcher, she initially referred the request back to that co-worker because Afzal had previously reassigned work relating to the attorney whose travel was at issue to that co-worker, but she eventually provided the requested assistance. Nevertheless, in the Reprimand, Afzal asserted that Fletcher flatly refused to help the co-worker as she had instructed. The Reprimand also warned Fletcher "that any future instances of misconduct will not be tolerated and could result in more severe disciplinary action being taken against you up to and including removal." J.R. 128.

### F.    Monetary Awards

In addition to taking these written actions against Fletcher, Afzal also failed to give Fletcher monetary awards in 2009. Although at the time GCF did not provide performance bonuses, employees could receive "Special Act" cash awards tied to specific instances of notable performance. J.R. 11. According to Fletcher, even though she went above and beyond ordinary work in a variety of areas in 2009, Afzal denied her any such awards, and she was the only support staff member who did not receive a monetary award during 2009. Afzal and Issenberg, however, have both asserted that Fletcher was granted two Special Act awards during fiscal year 2009 and provided records reflecting that she received such awards in February and May 2009.

### G.      Pre-Performance Improvement Plan

On April 29, 2010, during Fletcher's mid-year performance review, Afzal placed Fletcher on a pre-Performance Improvement Plan ("pre-PIP").  According to Afzal, she did so because Fletcher "showed little or no progress" after being assigned sole responsibility for the law library, file room, and office supplies.  J.R. 6.  The pre-PIP notice informed Fletcher that she was "currently performing at an 'unsatisfactory' level in one or more of the critical elements of your performance plan."  J.R. 94.  Specifically, the notice identified several tasks for Fletcher to complete in three main categories:  (1) maintaining and organizing the GCF law library, including updating the Code of Federal Regulations and other materials and maintaining library subscriptions; (2) maintaining and organizing the GCF files in the shared file room, including keeping abreast of applicable rules and regulations for file management and properly archiving various materials; and (3) maintaining and organizing office supplies, including ordering supplies and maintaining expense records.  The pre-PIP provided individual deadlines for certain tasks and set an overall deadline of 30 days.  If Fletcher did not complete the assigned tasks within this timeframe, the notice warned, she would be placed on a Performance Improvement Plan ("PIP").

Fletcher has asserted that it was not feasible to complete the tasks outlined in the pre-PIP in the allotted time because the law library and file room were in disarray since the time that Davis had responsibility over them, and she was not provided the necessary training and support to complete them.  According to Chi, organization of the file room required a legal degree or training in order to understand the significance of the materials to be organized.  Fletcher has stated that a NOAA records officer told her that she needed records management experience in order to complete the tasks relating to the file room.  Yet she received no guidance or assistance until shortly before the deadline for completion of the work, when she received help from the paralegal

in the office who had managed the library before Davis.  The enormity of these tasks required Fletcher to work beyond her normal hours in order to complete the work.

Afzal, however, did not perceive that Fletcher's other duties, which generally consisted of tracking time and attendance and processing travel records, prevented her from accomplishing these tasks.  On May 20, 2010, Afzal began requiring Fletcher to track how she spent her time in the office and submit daily worklogs to her.  Afzal did not require such submissions from any other employees.

### H.    Performance Improvement Plan

On August 10, 2020, Afzal issued a memorandum to Fletcher stating that she had "failed to achieve" the performance level "meets or exceeds expectations" as to her duties relating to the law library, the file room, and office supplies. J.R. 103.  Consequently, that same day, Afzal placed Fletcher on a PIP.  The PIP was similar in substance to the pre-PIP, detailing assignments relating to the law library, file room, and office supplies.

While she was on the PIP, Fletcher was denied a within-grade increase ("WIGI"), a "periodic increase[] in a GS employee's rate of basic pay" reserved for employees meeting performance requirements.  Joint Statement of Undisputed Facts ¶ 6, ECF No. 67.  While on a PIP, Fletcher was ineligible for a WIGI.  Based on an administrative error, however, Fletcher was initially granted a WIGI, but Afzal then rescinded it and required Fletcher to repay the money.  On October 25, 2010, Afzal sent Fletcher a memorandum notifying her of this action and providing the stated reason for it.  Fletcher has stated that this rescission was improper because her placement on the PIP was not justified and was motivated by color discrimination.

Three days later, on October 28, 2010, Afzal informed Fletcher during Fletcher's end-of-year performance review that she had failed to meet the requirements of the PIP.  According to

Afzal, although she deemed Fletcher to have "attained an acceptable level of performance for the Library Maintenance task," J.R. 16, she did not do so with respect to addressing the file room and maintaining supplies for the office.

On December 1, 2010, at a meeting with Fletcher, Afzal, and Cheryl Duffner, a NOAA Human Resources Specialist, Afzal attempted to give a Notice of Proposed Removal to Fletcher. Fletcher left the office without accepting the document and stated that she needed to contact her attorney. Fletcher was formally terminated on March 26, 2011.

## II.     Procedural History

After her termination, Fletcher filed an appeal to the Merit Systems Protection Board ("MSPB") on April 6, 2011, alleging both that her termination was procedurally and substantively improper and that it was based on race, color, and retaliation for her prior EEO activity. This Court has detailed the course of the administrative proceedings before the MSPB and the United States Equal Employment Opportunity Commission ("EEOC") in its opinion on the Motion to Dismiss. *See Fletcher*, 2018 WL 6031173, at *2-3.

On November 16, 2017, Fletcher filed her Complaint in the present case, alleging that she was subjected to disparate treatment and a hostile work environment on the basis of race and color (Count I) and that she suffered retaliation and a retaliatory hostile work environment because of her EEO activities (Count II), in violation of Title VII. On March 13, 2018, Commerce filed a Partial Motion to Dismiss, seeking dismissal of any claims of disparate treatment, discriminatory termination, and retaliation on the grounds that these claims were time-barred because they had been litigated before the MSPB and the EEOC, and Fletcher failed to file suit on those claims within 30 days of the EEOC decision resolving those claims. *Fletcher*, 2018 WL 6031173, at *3. The Court granted the Motion to Dismiss in part and denied it in part. *Id.* at *6. It dismissed any

freestanding disparate treatment, discriminatory termination, and retaliation claims as time-barred, but it denied the motion "to the extent that it seeks to preclude the Court from considering any particular facts in assessing Fletcher's discriminatory hostile work environment claim . . . and her retaliatory hostile work environment claim," both of which remained. *Id.* at *5-6.

## DISCUSSION

In its Motion for Summary Judgment, Commerce seeks judgment as a matter of law on the remaining discriminatory and retaliatory hostile work environment claims on the grounds that the evidence in the record does not establish a genuine issue of material fact whether Fletcher was subjected to a hostile work environment on the basis of race, color, or the protected activity of opposing discrimination. Specifically, it argues that the various actions taken against Fletcher, which it characterizes as designed to improve her performance and justified by the circumstances, were not sufficiently severe or pervasive to constitute a hostile work environment, and that in any event there is insufficient evidence to support a conclusion that any hostile work environment was based on race or color discrimination or retaliation for protected activity.

## I.      Legal Standards

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit

11

under the governing law." *Anderson*, 477 U.S. at 248.  A dispute of material fact is only "genuine"

if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict

for that party.  *Id.* at 248-49.

## II.     Hostile Work Environment

Fletcher's hostile work environment claims arise under Title VII, which bars employers

from discriminating against an employee "because of such individual's race [or] color," 42 U.S.C.

§ 2000e-2(a), or from retaliating against an employee "because [the employee] has opposed any

practice made an unlawful employment practice by this subchapter," 42 U.S.C. § 2000e-3(a).  An

employee who has been subjected to a hostile work environment based on race or color has a valid

Title VII discrimination claim.  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir.

2015).  Likewise, a Title VII retaliation claim may be based on the subjection of a plaintiff to a

hostile work environment in retaliation for opposing discrimination.  *Von Gunten v. Maryland*,

243 F.3d 858, 869 (4th Cir. 2001) ("Retaliatory harassment can constitute adverse employment

action."), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

67-68 (2006); *Fordyce v. Prince George's Cty.*, 43 F. Supp. 3d 537, 552 (D. Md. 2014)

("Retaliation claims under Title VII can be based on an employer's retaliatory creation of a hostile

work environment." (citing *Von Gunten*, 243 F.3d at 869)).

To establish a hostile work environment claim based on race, color, or retaliation, Fletcher

must show that (1) she experienced "unwelcome harassment"; (2) the harassment was based on

race, color, or retaliation for opposing such discrimination; (3) the harassment was "sufficiently

severe or pervasive to alter the conditions of employment and create an abusive atmosphere"; and

(4) there is "some basis for imposing liability on the employer."  *Bass v. E.I. DuPont de Nemours*

*& Co.*, 324 F.3d 761, 765 (4th Cir. 2003).  Harassment of an employee meets the requirements of

a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Rude treatment by co-workers, callous behavior by superiors, or a routine difference of opinion and personality conflict with an employee's supervisor ordinarily are insufficient to meet this requirement. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019). A court's determination whether a hostile environment exists includes a consideration of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 23). To meet this standard, the plaintiff must show both that, subjectively, the plaintiff perceived the environment to be abusive and hostile, and that, objectively, a reasonable person would also have perceived it to be abusive and hostile. *Perkins*, 936 F.3d at 208.

Commerce argues that Fletcher has not presented sufficient evidence that she was subjected to harassment severe or pervasive enough to constitute a hostile work environment. In particular, Commerce argues that Fletcher "does not allege any harassing comments on the part of any Agency employee or otherwise," and that the allegedly harassing actions cited by Fletcher were instead "acts taken as attempts to help [Fletcher] improve her performance and stave off her eventual termination." Mot. Summ. J. at 16-17, ECF No. 69-1. It further contends that where the identified actions "largely include the actions taken against her in response to the concerns regarding her performance," they generally "fall well short of alleging an abusive working environment." *Id.* at 15; *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011).

The bulk of Fletcher's proffered evidence of harassment consists of formal and informal actions by her supervisor relating to her duties, pay, and position.  Fletcher points to Afzal's decisions to remove her budget duties and to impose upon her sole responsibility for the law library and the file room.  She cites Afzal's failure to promote her a second time and favoritism toward Davis, the denial of monetary awards, and the rescission of a WIGI already awarded.  She also identifies personnel actions, including the Letter of Counseling, the Reprimand, the requirement that she keep daily logs of her work, the imposition and negative results of the pre-PIP and PIP, and Fletcher's ultimate termination.

The United States Court of Appeals for the Fourth Circuit, however, has concluded that similar actions, even if extremely unfavorable to the plaintiff, do not constitute a hostile work environment.  In *Perkins*, it found that unfavorable work assignments, heightened scrutiny of overtime and compliance with workplace rules, and denials of promotion requests did not add up to a hostile work environment in part because they could not reasonably be described as "physically threatening or humiliating."  *Perkins*, 936 F.3d at 209.  In *Bonds*, the court held that the plaintiff's allegations that she was removed from leadership positions, was investigated and had her work computer searched, was assigned to clean her office for 15 days, was prevented from communicating with coworkers, and was forbidden to attend a meeting related to her projects, then was placed on leave and fired for improperly transmitting protected information, "fall well short of alleging an abusive working environment."  *Bonds*, 629 F.3d at 375-76, 385; *see also Dortch v. Cellco P'ship*, 770 F. App'x 643, 645 (4th Cir. 2019) (holding that the plaintiff's supervisor's investigation into her team members' dissatisfaction with her and the subsequent decision to place the plaintiff on a PIP did not create an abusive working environment); *Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 162 (4th Cir. 2018) (finding that allegations of poor

performance evaluations, workplace disagreements, an additional workload, and an office relocation do not demonstrate an environment "permeated with discriminatory intimidation"). In light of this Fourth Circuit precedent, Fletcher's reliance on *Sims v. District of Columbia*, 33 F. Supp. 3d 1, 10 (D.D.C. 2014), a district court case from another circuit, is misplaced.

Here, the record evidence shows that the actions that underlie Fletcher's hostile work environment claim consist not of physical or verbal abuse that was "physically threatening or humiliating," but of adverse personnel actions—such as the failure to promote Fletcher, changes to her assignments, and the failure to provide her with monetary awards and a salary increase—as well as formal written disciplinary and performance-related actions, such as the Reprimand and the PIP. *Perkins*, 936 F.3d at 209. Even if these actions to Fletcher were found to be unjustified or improper, they qualitatively lack the discriminatory or retaliatory "intimidation, ridicule, and insult" that characterizes a hostile work environment. *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21).

To be sure, Fletcher has provided evidence, including the deposition testimony of Chi, that Afzal spoke to her in a demeaning, patronizing fashion, made unspecified snide comments, yelled at her "from time to time," J.R. 221 and told her that she was "in a box" and not required to think in her job. J.R. 166. Chi also testified that Afzal treated Davis more favorably, in a "businesslike" way. J.R. 222. As described in the record, this unprofessional and demeaning verbal abuse, while improper, does not rise to the level of a hostile work environment. As the Fourth Circuit has stated, "[i]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Perkins*, 936 F.3d at 208 (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)). "The 'standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.'" *Id.*

(quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (holding that allegations of a supervisor mockingly yelling at the plaintiff in a meeting, "yelling and pounding her hands on her desk during another meeting," "repeatedly harping on a mistake" by the plaintiff, "making snide comments" to the plaintiff, "playing favorites with employees and pitting employees against each other," and "unfairly scrutinizing and criticizing" the plaintiff's use of leave and lack of compliance with directives fall "far short of being severe or pervasive enough to establish an abusive environment" (internal alterations omitted)).

Even if the personnel actions and verbal comments were sufficient to establish a hostile work environment, Fletcher has produced no evidence that in any of these interactions, Afzal referenced race, color, or protected activity. *See Boyer-Liberto*, 786 F.3d at 277 (including as an element of a discriminatory hostile work environment claim that the conduct was on the basis of race); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005) (including as an element of a retaliation claim that the retaliation was causally linked with the protected activity). Fletcher's evidence that Davis, a colleague with lighter skin, was treated better by Afzal, without more, is not enough to establish that any hostile work environment was motivated by color discrimination. *See Perkins*, 936 F.3d at 209 (granting summary judgment on a hostile work environment claim even though there was evidence that company rules were enforced more strongly against African American employees and African Americans were denied promotions). Accordingly, the Court finds that there is insufficient evidence to support a conclusion that Fletcher was subjected to a hostile work environment in violation of Title VII.

Fletcher's citation to *Hoyle v. Freightliner, LLC*, 650 F.3d 321 (4th Cir. 2011), for the proposition that the Fourth Circuit has "never held that a weak case is necessarily one that should

be disposed of on summary judgment," does not alter this conclusion. *Id.* at 334. In *Hoyle,* the female plaintiff in a male-dominated workplace was subjected to the placement of a tampon in her work area, photographs of scantily-clad women taped to company toolboxes and in calendars circulated within the workplace, a photograph of a nude woman as the screensaver on a company computer, and, after the plaintiff began taping her pant legs to avoid getting dirty, a co-worker's question that "[y]ou're taping up your pant legs now so we can't see up under your pants?" *Id.* at 326-27. Thus, the court's reversal of a grant of summary judgment was based on evidence of far more demeaning and overtly discriminatory conduct than is present here.

In finding that the evidence does not support a finding that Fletcher was subjected to a hostile work environment within the meaning of Title VII, the Court does not conclude that Afzal's treatment of Fletcher was proper, or that the evidence would not support one of the time-barred freestanding claims of color discrimination or retaliation. Nevertheless, on the remaining hostile work environment claims before the Court, Fletcher has not provided sufficient evidence to establish a genuine issue of material fact warranting a trial. Accordingly, the Court will grant the Motion for Summary Judgment.

## CONCLUSION

For the foregoing reasons, Commerce's Motion for Summary Judgment will be GRANTED. A separate Order shall issue.

Date: May 21, 2020

        /s/ *Theodore D. Chuang*
        THEODORE D. CHUANG
        United States District Judge